## THE LUDVIG HOLBERG.

### STAFFORD *v.* THE LUDVIG HOLBERG.

### THE F. O. MATTHIESSEN & WIECHERS S. R. Co. *v.* THE LUDVIG HOLBERG.

*(Circuit Court, S. D. New York. June 5, 1890.)*

APPEAL—REVIEW—SUFFICIENCY OF EVIDENCE.
   The decision of the district court as to questions of fact will not be disturbed on appeal where the evidence is conflicting, and some of the witnesses were examined before the district judge.

In Admiralty. On appeal from district court.

#### FINDINGS OF FACT.

(1) The libelant Stafford was the owner of the bark Quickstep before and at the time of her loss on the 24th day of May, 1887. The libelant the F. O. Matthiessen & Wiechers Sugar Refining Company is a corporation, and was the owner of a cargo of sugar laden on board said bark.

(2) On the afternoon of the 24th day of May, 1887, the bark Quickstep, laden with a cargo of sugar, was being towed from sea into the port of New York by the tug-boat Leonard Richards, on a hawser 80 fathoms long. While proceeding up about in the middle of the main ship channel, and when a little to the southward and eastward of buoy No. 11, at about 4:26 P. M., she was run into by the steam-ship Ludvig Holberg; the latter vessel striking the bark on her port quarter, about the mizzen topmast backstay, cutting into her after companion door a distance of about nine feet, cutting her open so that the cargo rolled out. Immediately after the collision said bark began to sink, and, while sinking, was towed by the tug on to the west bank, where she grounded in 25 feet of water, about a quarter of a mile below buoy No. 11, and became a total loss, and her cargo was nearly all lost.

(3) The bark was 170 feet long, 37 feet beam, 23 feet depth of hold, and was laden with 1,024 tons of sugar, and drew 20 feet of water.

(4) The Ludvig Holberg, which hails from Bergen, Norway, was an iron screw steam-ship of 687 tons register, 200 feet long. The claimants

Christopher Kahrs and others were her owners. She was in ballast, drawing 13 feet aft and 9 feet forward, bound for Barracoa for fruit. She was tight, staunch, and strong, properly manned and officered, having a competent master and officers, and a full complement of men. At and prior to the time of collision her master and pilot were on the bridge. She steers by hand, and there was at her wheel one ordinary seaman steering the vessel as directed by the pilot. The first officer and second officer were on lookout, on the port and starboard sides, respectively, of the forestay, which is fastened to the stem. Back of them, by the windlass, was the carpenter, also on lookout.

(5) The steam-ship started from pier 15 E. R., some time between 3:05 and 3:15 P. M. She ran slow out of the East river, but soon increased to full speed, and continued to run at that rate until, fog having set in, she reduced to half speed, and later to dead slow. Her motion through the water, was, while at full speed, about 9 to 9½ knots; while at half speed about 6½ to 7 knots; while at dead slow about 3½ knots an hour. She had been running at the latter rate for a few minutes only, probably not more than four or five, before the collision. The pitch of her screw was 14 feet 2 inches, and at full speed she made from 69 to 71 revolutions per minute; at half speed from 40 to 45 to 50 revolutions per minute, and at slow speed from 20 to 25 to 26 revolutions per minute.

(6) She was off Bedloe's island between 3:27 and 3:32, and it was nearly 4 o'clock when she reached Fort Lafayette. The distance from that point to the place of collision is a little over 3⅜ knots. She carried the ebb tide with her from Bedloe's island to a little below the forts. After a brief period of slack water, and until the collision, there was a flood tide. Its set was about S. W., which helped a vessel coming in about one knot an hour, and a vessel going out about half a knot an hour. The wind was southerly, blowing a stiff breeze.

(7) At the time and place of collision there was so much fog as to prevent vessels from being visible to each other for more than a short distance, (estimated by the witnesses from the Holberg at between 200 and 300 feet,) and such as to require the sounding of fog-signals under the rules. Such signals were sounded by the Ludvig Holberg. This fog had prevailed between the Narrows and buoy No. 11 during a period of at least 15 minutes before the collision.

(8) The Ludvig Holberg ran into this fog about the time she passed the forts, and at that time began sounding fog-signals, but did not reduce her speed until she had run some distance below the forts. Then she reduced to half speed only, and did not further reduce her speed until about buoy No. 13.

(9) By the time she reached a point a little below buoy No. 13, she had slowed down to about four knots over the ground. From that point to the place of collision, a distance of about 4,500 feet, she did not increase her speed, proceeding down the channel, keeping upon the starboard side, as near the channel buoys as she could safely go, and sounding fog-signals from time to time.

(10) While she was thus proceeding she heard one blast right ahead, then another a little more on the starboard bow. Both these were blown by the tug, which was not at that time visible through the fog to those on board the Holberg.

(11) Almost immediately thereafter the tug came in sight, only a few hundred feet off, and a little on the steamer's starboard bow, and gave a signal of two blasts.

(12) Neither the bark nor the hawser were then visible, and no signals indicated to the Ludvig Holberg that the tug had a tow nearly 500 feet behind her.

(13) Upon receiving the whistle of two signals from the tug, the steamer starboarded, and passed the tug starboard to starboard clearing her about 30 feet.

(14) Then for the first time the Ludvig Holberg became aware of the presence of the Quickstep, which was not following directly after the tug, but to starboard of her, and whose pilot at that time, by putting her wheel hard a-port, threw her head somewhat more to starboard.

(15) Thereupon the steam-ship ported in order to go between the tug and the bark, at the same hailing the tug to cast off the hawser.

(16) If the hawser had been cast off promptly the steamer would probably have gone safely between the tug and the bark.

(17) The hawser was not cast off, and, the steamer, running against it with her starboard bow, parted it, and at the same time her bow was swung to port, resulting in collision with the bark's port quarter.

(18) The steamer stopped and reversed as soon as she saw that the tug had a vessel in tow, but not before, and was nearly stopped at the time of collision.

(19) Had the steamer been aware when she starboarded to pass the tug that the latter vessel had the Quickstep in tow on a hawser of 80 fathoms she could, and in all probability would, have avoided the collision.

### CONCLUSIONS OF LAW.

(1) Said collision was not due to any fault or negligence of those in charge of the Ludvig Holberg.

(2) The libels herein should be dismissed, as already decreed by the district court, with costs to the claimants in both courts.

*Owen, Gray & Sturges,* for the Quickstep.

*Sidney Chubb,* for the owners of her cargo.

*Wing, Shoudy & Putnam,* for the Ludvig Holberg.

LACOMBE, J. As to the presence or absence of fog, and as to the speed of the Ludvig Holberg,—the two determinative questions of fact in this case,—there is great conflict of testimony. The witnesses from the Holberg testify most positively that during their run from the Narrows to below buoy No. 11 so dense a fog prevailed that vessels could be seen only at a short distance, and that the steamer sounded fog-signals, and reduced her speed. Those from the bark and the tug as positively assert the contrary. Of the witnesses other than those from these three vessels

some support the libelant's case, others that of claimants.    Finally, in the testimony of nearly every witness there is much inconsistency, and it is impossible to frame such a theory of what occurred as will harmonize with all the proof.   Some of the witnesses who testified on this branch of the case were examined before the district judge.   His decision, therefore, is affirmed.   In so doing the evidence of those on the Holberg must be in part accepted and in part discredited; either the fog prevailed for a time much less than they say it did, or she ran at full speed for some time after it shut in.   It is, however, natural to expect that a witness who is testifying to the density of the fog, or the duration of a period of reduced speed, when the fog or reduction of speed is supposed by him to help his side of the case, will exaggerate his estimate in both particulars.   That his narrative thereby becomes inconsistent is not by itself sufficient to require its entire rejection, especially where it is in part corroborated by other proof.   In this case the disinterested witness who concededly was nearest to the collision both in time and place testified that he overtook and passed the Holberg going slow in a dense fog, with her fog-signals sounding; and that there was dense fog in the Narrows at about 4 P. M. is testified to by the light-house keeper at Fort Tompkins, (whose evidence is corroborated by his log-book,) and by the soldier at the same fort.   The decree of the district court is affirmed, and the libels dismissed.